**Maria BATISTA, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CV–02–3779(RJD).**

United States District Court, E.D. New York.

June 18, 2004.

---

Maria Batista, Mastic, NY, Plaintiff Pro Se.

Tracey Jenell Knuckles, United States Attorneys Office, Brooklyn, NY, for Defendant.

## MEMORANDUM & ORDER

DEARIE, District Judge.

*Pro se* plaintiff Maria Batista challenges the final determination of the Commissioner of Social Security Administration (the "Commissioner") that her disability ceased as of March 1999. Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Commissioner moves for judgment on the pleadings, affirming the Administrative Law Judge's ("ALJ's") decision terminating the plaintiff's benefits. For the reasons that follow, the case is remanded for further development of the record.

### Background

#### A. *Earlier Disability Determination*

The plaintiff has a history of kidney disease, which resulted in the removal of her left kidney in 1987. She also suffers from high blood pressure and urinary tract infections.[1] On August 12, 1993, she filed an application for Supplemental Security Income ("SSI") benefits, alleging disability due to kidney problems and hypertension. Tr. 87–90. Her application was denied initially and on reconsideration. Tr. 91–91, 101–04, 107–10. The plaintiff then requested a hearing and appeared *pro se* before an Administrative Law Judge ("ALJ"). Tr. 240.

In a decision dated July 26, 1995, the ALJ found the plaintiff disabled as of August 12, 1993. Tr. 240–42. The medical evidence established that the plaintiff suffered from severe hypertension, kidney disease, and recurrent urinary tract infections. Relying on the plaintiff's medical records as well as a consultative examination performed by Dr. C.S. Phatak, the ALJ found that the plaintiff did not have the residual functional capacity for even sedentary work because of her inability to lift or carry more than five pounds, her inability to stand or walk for more than two hours in an eight hour workday, and her shortness of breath. He also concluded that she was unable to perform her past relevant work or engage in any other substantial gainful employment. Consequently, the ALJ found the plaintiff disabled as of August 1993. Tr. 240–42.

#### B. *Continuing Disability Review and Cessation Determination*

In March 1999, the Social Security Administration ("SSA") conducted a continuing disability review. The SSA determined that there was significant medical improvement in the plaintiff's condition, and thus found that her disability ceased as of March 30, 1999. Tr. 243–48. The plaintiff requested reconsideration, and a disability hearing officer affirmed the initial determination. Tr. 263. 266–77. She then requested a hearing before an ALJ. Tr. 278. The plaintiff failed to appear at the scheduled hearing, and ALJ Sol A. Wieselthier dismissed her case on September 20, 2000. Tr. 440–41. The plaintiff appealed, and the Appeals Council vacated the order of dismissal and remanded to the case to the ALJ for further proceedings. Tr. 449.

---

1. The plaintiff's extensive medical history relevant to the previous disability determination is set forth in the Administrative Transcript and will not be generally repeated.

On December 19, 2001, the plaintiff appeared and testified at a hearing before ALJ Wieselthier with the assistance of a representative from Legal Aid. Tr. 28–60. The ALJ issued an opinion on January 23, 2002, which found that the plaintiff's medical condition had improved, that she was capable of performing medium work,[2] and that her disability ceased as of March 1999. Tr. 12–19. On June 12, 2002, the ALJ's decision became final when the Appeals Council denied the plaintiff's request for review of the hearing. Tr. 5–7. This action followed.

In October 2003, the plaintiff submitted new evidence to the Court. The new evidence consisted of additional progress notes from Queens Hospital Center from 2000–2003.

### C. *Medical Evidence Related to the Cessation Determination*

#### 1. Treating Sources

Following the first disability determination, the plaintiff was followed at Queens Hospital for hypertension and complaints of dizziness, headaches, occasional right flank pain, and recurrent urinary tract infections through April 1997. Tr. 391–404.

Between July 1995 and February 1999, the plaintiff was also treated at Mt. Sinai Hospital for gastroesophageal reflux disease, chest pain, recurrent urinary tract infections, and abdominal pain. Tr. 334–88. The plaintiff underwent two ventral hernia repairs in 1995 and 1996. *See* Tr. 339, 367. From August 1996 through March 1999, the plaintiff's complaints and diagnoses were predominantly related to the hernia repairs and the persistent sinus drainage she suffered as a result of the operations. *See* Tr. 339–367.

The plaintiff also complained of migraine headaches and dizziness. She first complained of the headaches and dizziness in May 1996. Tr. 373. Progress notes reveal that the headaches and dizziness were under control as of August 1996. Tr. 368. In May 1999, however, the plaintiff returned to Mt. Sinai complaining of posterior headaches, which were occurring 1–2 times a week. Tr. 411. The neurological exam was unremarkable and the doctor prescribed Excedrin to treat the headaches. *Id.*

In June and July 1999, the plaintiff reported some complaints of abdominal pain, but her examinations were unremarkable. Tr. 408, 337. In October 1999, the plaintiff had an excisional biopsy of a left breast mass. The surgical pathology report revealed a hyalinized fibroadenomas, benign masses. Tr. 419–420.

#### 2. Consultative Examinations

On March 10, 1999, Dr. Lee Mescon, a consulting physician, examined the plaintiff. Tr. 429–32. The plaintiff related a history of kidney disease and recurrent urinary tract infections, but she denied any history of hypertension. Tr. 429. She informed Dr. Mescon that she was able to walk ten blocks, sit intermittently for four hours, stand for two hours, shop, cook, clean, and travel alone on public transportation. *Id.* Upon examination, the plaintiff's blood pressure was 130/90 and her gait was normal. Tr. 429–30. Dr. Mescon observed that the plaintiff was able to get on and off the examination table, and dress and undress, without assistance. Tr. 430. The rest of the examination was unremarkable. Tr. 430–31. Dr. Mescon opined that on the basis of the plaintiff's

---

**2.** Medium work entails lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.

If a person is able to do medium work, then he or she can also do sedentary or light work. 20 C.F.R. § 406.1567(c).

history and the physical he performed, the plaintiff had no limitations. Tr. 431.

On March 29, 1999, a state agency consultant assessed the plaintiff's residual functional capacity. Tr. 421–28. The examiner based his conclusions on the plaintiff's medical history and the consultative examination performed by Dr. Mescon. Tr. 422. He determined that the plaintiff could occasionally lift and carry up to 20 pounds, stand and walk for a total of 6 hours in an 8 hour work day, and sit for up to 6 hours in an 8 hour workday. Tr. 422. He also opined that the plaintiff had an unlimited ability to push and pull, and noted that the plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 422, 424–25.

On July 12, 1999, Dr. Howard Finger, a consultative physician, examined the plaintiff. The plaintiff related a history of hypertension, a heart murmur, chest pains with palpitations, status post left nephrectomy, and migraine headaches. Tr. 433–35. She stated that she takes a variety of over the counter medications to treat her migraines. Tr. 433. She stated that her right kidney was enlarged and she described frequent right flank pain. The plaintiff was unaware of any kidney stones at the time of the examination. *Id.* She informed Dr. Finger that she did light household tasks but avoided heavy lifting and carrying, and she stated that she was often accompanied when she traveled. *Id.*

Upon examination, the plaintiff's blood pressure was 130/80. *Id.* Dr. Finger observed a fullness in the right abdomen area likely due to an enlarged right kidney. Tr. 434. The plaintiff was able to flex forward to about 80–90 degrees before complaining of mild discomfort in the right flank area. Her gait was slow but otherwise normal, and she exhibited functional 4+/5 muscle strength in each lower extremity. *Id.* The doctor observed that she was able to dress herself slowly and there was no impairment of fine dextrous movements in either hand. *Id.*

Dr. Finger's impressions were (1) atypical chest pain and palpitations; (2) history of recurrent headaches; (3) status post left nephrectomy; (4) right hydronephrosis; and (5) hypertension. Tr. 435. He noted that her blood pressure was moderately controlled at the time of the report, and opined that the her prognosis was "guarded." In regard to the plaintiff's work related activities, he determined that she had no gross difficulties in terms of sitting and that she was mildly limited in her ability to stand, ambulate, and lift and carry. *Id.*

### D. *Medical Expert's Testimony*

Dr. Richard Wagman, a medical expert, testified at the hearing before the ALJ on December 19, 2001. Tr. 54–60. Dr. Wagman did not examine the plaintiff but he reviewed her medical records and concluded that the symptoms she described were "vastly out of proportion to anything in [the] record from 1999." Tr. 55. He reported that the plaintiff had her left kidney removed in 1987, and incisional hernia repair in 1995 and 1997. The plaintiff had suffered from persistent sinus tract problems from the hernia repairs, but Dr. Wagman noted that she had corrective surgery in 1997. Therefore, he concluded that as of 1999 the plaintiff's sinus tract problem was no longer an issue. Tr. 54–55. He further noted that the plaintiff's blood pressure was controlled by medication and was normal in 1999. Tr. 55. Dr. Wagman acknowledged the plaintiff's history of chest pains but considered her symptoms insignificant and noted that there was no evidence of heart disease. Tr. 56. Additionally, he reported that the plaintiff had only two urinary tract infections in 1999, both of which were successfully treated with antibiotics. Tr. 56.

Dr. Wagman also noted the plaintiff's complaints of abdominal pain. Tr. 58. He testified that pain may accompany urinary tract infections, but he opined that the pain described by the plaintiff was inconsistent with the pain associated with urinary tract infections. Tr. 58–59. He also noted that the plaintiff did not have chronic urinary tract infections in 1999.

Dr. Wagman opined that the plaintiff had no limitations on standing, walking, bending, or lifting in 1999. Tr. 57. He concluded that the plaintiff had no impairment as of March 1999, and he assessed her residual functional capacity to be medium. *Id.*

### E. Plaintiff's Hearing Testimony Relating to Cessation of Benefits

The plaintiff was born on April 1, 1964 in the Dominican Republic, and she emigrated to the United States in 1988. Tr. 31. She never completed high school. Tr. 34. The plaintiff worked in a glass factory for 4–5 months in 1988 and in an electrical socket factory for approximately one year beginning in 1990. Tr. 35–36. *Id.* She has not worked since 1990.

The plaintiff testified that she understood some English, but she stated that she could not read or write in English. Tr. 32. At the time of the December 19, 2001 hearing, she lived with her twelve year old son in an elevator apartment building. Tr. 31. In 1999, the plaintiff was being treated at Mt. Sinai Hospital in Manhattan. Tr. 39. She testified that she visited Mt. Sinai as often as once a month, and she traveled by train to her appointments. Tr. 42. In 2000, the plaintiff stopped going to Mt. Sinai because she started getting dizzy on the train. Tr. 33. At the time of the hearing, the plaintiff was receiving treatment at Queens Hospital Center. Tr. 33, 41–42. She testified that she visits Queens Hospital Center ev-

ery three months and she travels by bus. Tr. 33, 42. She stated that in 1999, she suffered from right kidney pain, high blood pressure, dizziness, and headaches. Tr. 39, 52–53. Her hypertension was controlled by medication, and her headaches were treated with over the counter medications. The plaintiff had one kidney infection in 1999 and two in 2001. She took Cipro to treat the infections. Tr. 49–51. The plaintiff also had hepatitis and claimed to have taken Cipro to treat that as well. Tr. 50.

At the hearing, the plaintiff testified that she could not stand for more than two hours without her feet swelling. Tr. 37. She described the swelling as a new problem. She testified that her doctor informed her that the swelling resulted from water retention, and told her that she could not take medication for the condition because it would damage her kidneys. Tr. 38.

Plaintiff testified that in 1999, she had no problems walking, sitting, kneeling, or bending over, and she stated that she was able to lift up to five pounds on her own. Tr. 42–43. The plaintiff walked her son to and from school every day, a distance of two and half blocks. Tr. 43.

The plaintiff testified that she cooked, washed dishes, made beds, and dusted. Tr. 44. She also stated that she was able to dress and feed herself without assistance. Tr. 45. The plaintiff's sister helped her with her food shopping. Tr. 43. The plaintiff uses public transportation, and she traveled by bus to the hearing. Tr. 32. In her free time, the plaintiff watches television and occasionally reads. Tr. 45.

### Discussion

### A. Standard of Review

#### 1. Scope of Review

 In reviewing the ALJ's finding that a plaintiff is not disabled, a district

court "may only set aside a determination which is based upon legal error or not supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Furthermore, "it is up to the agency, not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir.1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991). This court "may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." *Id.* (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

### 2. *Standard for Termination of Disability Benefits*

■ Once the SSA determines that a claimant is entitled to benefits, it conducts periodic reviews to evaluate the claimant's continued eligibility to receive benefits. *See* 20 C.F.R. § 416.994(a). Upon review, if the Commissioner finds that a claimant is no longer disabled, her benefits may be terminated. 42 U.S.C. § 1382(c)(4). However, benefits may only be terminated if there is substantial evidence that the claimant's impairment has improved to such an extent that she is now able to engage in substantial gainful activity. *Id.; see also Matice v. Comm'r of Social Security,* No. 6:99–CV–1834(GLS), 2004 WL 437472, at *3 (N.D.N.Y. Feb. 11, 2004).

■ To ensure that disability reviews are uniform, the SSA follows specific procedures in determining whether an adult's disability continues. *See* 20 C.F.R. § 416.994(b)(5); *see also Lora v. Massanari,* No. 00CIV.8958(BSJ)(RLE), 2002 WL 655208, at * 6 (S.D.N.Y. April 18, 2002). First, the SSA assesses whether the claimant's impairment or combination or impairments meets or equals an impairment contained in the Listing of Impairments. If the claimant does not have such an impairment, the SSA must then determine whether there has been medical improvement in the claimant's condition. *See* 20 C.F.R. § 416.994(b)(5)(ii). "Medical improvement" is defined as any decrease in the medical severity of the claimant's impairments. The SSA determines medical improvement by evaluating "changes (improvement) in the symptoms, signs, and or laboratory findings associated with [a claimant's] impairments." 20 C.F.R. § 416.994(b)(1)(i). In order to make this determination, "the SSA must compare the current medical severity of the impairment to the medical severity of the impairment at the time of the most recent favorable medical decision." *Veino v. Barnhart,* 312 F.3d 578, 586–87 (2d Cir.2002).

If there has been medical improvement, the SSA must decide whether the medical improvement relates to the claimant's ability to work, i.e., whether there has been an increase in the claimant's residual functional capacity based on the impairment that was present at the time of her most recent favorable medical determination. If the claimant's medical improvement is related to her ability to work, the next inquiry is whether in combination of all of the claimant's current impairments are severe. If the claimant's impairments are

indeed severe, the SSA must then assess the claimant's current ability to perform substantial gainful activity, considering the claimant's residual functional capacity, past work experience, age, and education. *See* 20 C.F.R. § 416.994(b)(5)(iii)-(vii).

Any determination relating to the cessation of benefits under 42 U.S.C § 1382c must be made "on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition which is presented by the individual or secured by the Commissioner of Social Security."

## B. *Application to the Case*

■ In determining whether the plaintiff's disability continued, the ALJ followed the sequential analysis set forth in the regulations. He first found that the plaintiff was status post left nephrectomy and that she suffered from occasional right kidney enlargement, hypertension without complications, and headaches of unknown cause. Tr. 18. Although the ALJ determined that the plaintiff's impairments did not meet or equal the severity of an impairment listed in the Appendix, he found that her current impairments were severe. *Id.* He also concluded that the medical evidence established that there had been medical improvement in the plaintiff's condition since the date of the most recent favorable decision on July 26, 1995. *Id.*

The ALJ next assessed the plaintiff's residual functional capacity. Based on the medical findings, the assessments of impartial consultants, the testimony of Dr. Wagman, and the plaintiff's activities, he determined that as of March 1999, the plaintiff had the residual functional capacity to perform medium work. Tr. 17. He then considered the plaintiff's residual functional capacity, age, education, and

past work experience, and determined that she was not disabled. Tr. 19.

### 1. *Failure to Fully Develop the Record*

■ Although the ALJ followed the sequential analysis, he did not adequately develop the record. "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982)); *Rodriguez v. Barnhart*, No. 02–CV–5782(FB), 2003 WL 22709204, at * 3 (E.D.N.Y. Nov.7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir.1999)). The ALJ's duty to develop the record "includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled." *Rodriquez v. Barnhart*, 2003 WL 22709204, at * 3. The duty to develop the record also includes advising the plaintiff of the importance of such evidence. *Jones v. Apfel*, 66 F.Supp.2d 518, 524 (S.D.N.Y.1999). Although an ALJ's obligation to develop the record is heightened where the claimant appears *pro se*, *see Echevarria*, 685 F.2d at 755, the duty still exists even where the claimant is represented by counsel or a paralegal. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999); *Perez*, 77 F.3d at 47.

■ The duty to develop the record goes hand in hand with the treating physician rule, which requires the ALJ to give special deference to the opinion of a claimant's treating physician. *See Serrano v. Barnhart*, No. 02 CIV.6372 LAP AJP,

2003 WL 22683342, at * 13 (S.D.N.Y. Nov.14, 2003) (Report and Recommendation). It is paramount that the ALJ assist claimants in obtaining records from their treating sources. Specifically, it is incumbent upon the ALJ to obtain a report from the treating physician "[setting] forth the opinion of [the] treating physician as to the existence, the nature, and the severity of the claimed disability." *Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991). At a minimum, if the ALJ is inclined to deny benefits, he should advise a claimant that her case is unpersuasive and suggest that she supplement the record or call her treating physician as a witness. *See Serrano*, 2003 WL 22683342, at * 14.

■ Here, the ALJ did not adequately develop the record. Although he discussed the plaintiff's Mt. Sinai records in great detail in his decision, he failed to obtain updated residual functional capacity ("RFC") assessments from either Mt. Sinai or Queens Hospital Center. While it is true that the plaintiff was no longer being treated at Mt. Sinai at the time of the hearing, there is no reason why the ALJ could not have at least attempted to obtain an assessment from her treating physician there. Moreover, the ALJ could have obtained an RFC from Queens Hospital Center, where the plaintiff was then receiving treatment. A report from Queens Hospital, the plaintiff's current treating source, is especially relevant because the ALJ is required to make his determination on the basis of all available evidence, including evidence about the claimant's current condition. *See* 42 U.S.C. § 1382c; *see also Veino*, 312 F.3d at 587 (noting that the record in disability termination case properly contained substantial evidence relating to the claimant's current condition, including a report from his treating physician).

The ALJ's failure to obtain a treating physician report is especially troublesome in light of one of the comments in Dr. Finger's consultative report; a report on which the ALJ relied heavily. In his report, Dr. Finger diagnosed the plaintiff with hydronephrosis (an enlarged kidney), but he specifically noted the need for additional records from her treating sources relating to that diagnosis. Tr. 435.

Finally, the ALJ fell short by failing to advise the plaintiff of the importance of her treating physician's RFC assessment. *See Serrano*, 2003 WL 22683342, at *17 (finding that the ALJ committed error by not informing pro se plaintiff of the importance of the treating physician's opinion and that he himself could request a statement). RFC is critical to the determination of whether a plaintiff's disability continues because in order to terminate benefits, the Commissioner must compare present RFC with prior RFC.

### C. *Remand*

■ A remand under the fourth sentence of 42 U.S.C. § 405(g) is appropriate when the Commissioner did not make explicit findings or failed to correctly apply the law and the regulations. *See Melkonyan v. Sullivan*, 501 U.S. 89, 101, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991); *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.1999). Accordingly, because the ALJ failed to adequately develop the record in reaching his determination of the plaintiff's residual functional capacity, the Court need not decide whether the ALJ's opinion was supported by substantial evidence. The case is remanded.

### D. *New Evidence*

In October 2003, the plaintiff submitted additional records directly to this Court. These records include hospital records from 2000–2003.

 

The Court may only consider new evidence if it is "1) 'new' and not merely cumulative of what is already in the record and 2) material, that is, both relevant to the claimant's condition during the time period for which benefits are denied and probative...[3)] the claimant must show... good cause for her failure to present the evidence earlier." *Lisa v. Sec'y of the Dep't of Health and Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991). The concept of materiality also requires a reasonable possibility that the new evidence would have influenced the Secretary to decide the application differently. *Id.*

Because additional medical evidence must relate to the relevant period, the progress notes pre-dating January 23, 2002, should be considered on remand. Moreover, although the remainder of the records are from after the ALJ's decision, the Court nevertheless thinks this information should be considered by the ALJ on remand. "[D]iagnoses post-dating the relevant period may reveal that a claimant 'had an impairment substantially more severe than was previously diagnosed.'" *Fernandez v. Apfel,* No. 98–CV–6194 (JG), 2000 WL 271967, at *9 (E.D.N.Y. March 7, 2000) (quoting *Lisa v. Sec'y of the Dep't of Health and Human Servs.,* 940 F.2d 40, 44 (2d Cir.1991)). Furthermore, "such evidence can also substantially bolster the credibility of the claimant's subjective complaints." *Id.* (internal quotations and alterations omitted). It may be that these additional notes help to flesh out the record regarding the plaintiff's ability to perform medium work, and since the Court is already ordering a remand for other reasons, the ALJ should consider these reports as well. *See id.* at *9 (directing the ALJ to consider medical reports which were prepared almost two years after the ALJ's decision because the reports may

have been able to fill the gaps in the administrative record).

### Conclusion

For the foregoing reasons, the case is remanded to the ALJ for further development of the record.

SO ORDERED.