Mary PRICE o/b/o A.N.,
an Infant, Plaintiff,

v.

Michael J. ASTRUE, as Commissioner
of Social Security, Defendant.

No. 09–cv–5109 (NG).

United States District Court,
E.D. New York.

Signed Aug. 1, 2014.

Filed Aug. 6, 2014.

Michael D. Hampden, Legal Services for Children, Inc., New York, NY, for Plaintiff.

Kenneth M. Abell, United States Attorneys Office, Brooklyn, NY, Social Security Administration, Social Security Administration, for Defendant.

## OPINION AND ORDER

GERSHON, District Judge:

Plaintiff Mary Price brings this action seeking court review of the July 2, 2009 final decision of the Commissioner of Social Security (the "Commissioner"), by which her application for Supplemental Security Income benefits, made on behalf of her infant grandson, was denied. The Commissioner now moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Also moving under Rule 12(c), plaintiff seeks a judgment reversing the Commissioner's determination and remanding for further proceedings. She also requests that, upon remand, the matter be assigned to a different Administrative Law Judge.

For the reasons set forth below, the Commissioner's motion is denied and plaintiff's motion is granted in part and denied in part.

## BACKGROUND

### I. Factual and Medical Background before the Administrative Law Judge ("ALJ")

Plaintiff's infant grandson ("A.N.," or, the "Child") was born June 12, 2002, two months prior to his due date and weighing in at only two pounds. As a result of his mother's substance abuse during her pregnancy, A.N. was born addicted to crack cocaine. (*See* A.R. 225–26.[1]) He remained in the hospital for a month and a half following his birth, during which time he was tube-fed. (*Id.* at 163; 171.) He suffered from many ear infections during his early years, and a slight hearing impairment was diagnosed at age two. (*Id.* at 171.) A.N. was treated at Woodhull Medical Center for an injury to his cheek in 2006 and for an injury to his hand in 2007. Neither injury was determined to be traumatic. (*See id.* at 152, 154, 164, 165.)

A.N. reached most motor developmental milestones within normal limits, but his language development was slightly delayed. (*See id.* at 171, 211, 215, 225–26.) In light of this delay, and some behavioral problems he exhibited at daycare, the Child was referred for a psychological examination on April 24, 2006.[2] The evalua-

tion included testing on the Wechsler Preschool and Primary Scale of Intelligence—Third Edition (the "WPPSI–III") and the Vineland Adaptive Behavior Scales—Second Edition (the "Vineland Scales"), as well as clinical observation and an interview with A.N.'s mother, (*See* A.R. 211–212.) The psychologist-evaluator concluded that A.N.'s socialization and communication skills were delayed by at least a year and his cognitive skills were at the low normal range, while his daily living and motor skills were within normal limits. (*Id.* at 215.) Further assessment, including a speech and language assessment on May 24, 2006 and an educational assessment conducted June 8, 2006, revealed that A.N. had "attention difficulty" and delays in all domains other than motor development. (*See id.* at 216–24.) Therapy and special education services were recommended, both of which commenced in July 2006, upon A.N.'s entry into a pre-kindergarten special education program which was to run for the duration of the 2006–07 school year. (*See id.* at 209–10; 217–24.)

Two reports were issued toward the end of the 2006–07 school year. The first, an Individualized Education Program ("IEP") dated April 20, 2007, concluded that A.N. demonstrated several skills at age appro-

---

**1.** Administrative Record, submitted March 18, 2010, and Supplemental Administrative Record, submitted April 26, 2010. The supplemental submission contains only a complete copy of the transcript of the May 29, 2009 administrative hearing.

**2.** The April 24, 2006 report states that A.N. was referred for the evaluation by his "parents." (A.R. 211.) However, it is not clear whether A.N., was, by that time, already living with grandparents. According to the May 3, 2007 Special Education Assessment, the Child was then living with "his grandmother, Ms. Price who is his legal guardian" and who had been caring for him and his brothers *"for the past year* because his parents are not around due to drugs and domestic issues."

(*Id.* at 201, emphasis added.) This would mean A.N. had been in plaintiff's custody as early as May 2006. According to the August 8, 2008 report of Agency psychiatrist Christopher Ricci, Ph.D., however, A.N. was cared for by his cousin "for a few years" after his birth, (*Id.* at 226.) He was returned to his mother's custody "for approximately three years," but in November 2007 was removed to the custody of plaintiff as a result of "his mother's continued substance abuse treatment and the father having been incarcerated at the time." (*Id.*) Regardless of the precise timing of his move, there is no dispute that A.N. was in plaintiff's custody during the time period encompassing the application for SSI benefits and subsequent proceedings.

priate limits and that he had "made great progress since the beginning of the intervention," but also that he "sometimes loses focus easily" and "requires much repetition and review . . . in order to learn and maintain concepts/readiness, and skills." (*Id.* at 168–69.) The April 20, 2007 recommendation was that, although his behavior "*no longer* seriously interferes with instruction," he continues to require the assistance of a Special Education Itinerant Teacher ("SEIT") and related services. (*Id.* at 170, emphasis in original.) The IEP recommended that the Child be classified as a "Preschool Student with Disability," although the disability was not specified.[3] (*Id.* at 166.)

The following month, A.N. was again evaluated to ascertain his readiness for kindergarten. Pursuant to assessments made by his school psychologist, his regular classroom teacher and his SEIT, the IEP team concluded on May 3, 2007 that the Child was "hyperactive and impulsive, which *often interferes* with his ability to attend and complete tasks." (*Id.* at 205, emphasis added.) The team recommended that A.N. "receive a classification of Other Health Impairment" and stated that he "would benefit from a more structured instruction environment such as a Special Class in a Specialized School (12:1:1) to address academic and social emotional difficulties."[4] (*Id.*) The IEP team also recommended counseling, speech and language therapy, and "psychiatric evaluation to assess hyperactive and aggressive behaviors."[5] (*Id.*)

The remaining evidence reflecting the time period prior to plaintiff's application for SSI benefits on A.N.'s behalf is the IEP dated May 12, 2008, which sets forth the team's recommendations for the 2008–09 school year. The IEP team again recommended a classification of "Other Health Impairment" and further recommended a "small class in a community school with related services (12:1:1)" for the Child's first grade year. (A.R. 137, 145.[6]) The May 12, 2008 report indicates that A.N. "is a very energetic student [who] is responding better to authority . . . [and] is receptive to being redirected." (*Id.* at 140.) Although there had been

3. The definitions of the various terms used to classify a "[s]tudent with a disability" are set forth in the Regulations of the Commissioner of the New York State Department of Education, 8 N.Y. Comp.Codes R. & Regs. Tit. 8, § 200.1. The "Preschool student with a disability" designation indicates that the student "has been identified as having a disability and can receive appropriate educational opportunities from special programs and services approved by the department." *Id.* § 200.1(mm). A student so designated will have exhibited "significant delay or disorder in one or more functional areas . . . which adversely affects the student's ability to learn," or will have satisfied certain other criteria, including meeting one or more of the definitions set forth in § 200.1(zz). *Id.*

4. The "Other Health Impairment" classification is used to describe children who "have limited alertness with respect to the educational environment, that is due to chronic or acute health problems, including but not limited to . . . attention deficit hyperactivity disorder." 8 N.Y. Comp.Code R. & Regs. Tit. 8 § 200.1(zz)(10). The designation of (12:1:1) refers to the student-teacher-assistant teacher ratio.

5. It is not clear from this record whether the April IEP was amended to incorporate the test results and recommendations set forth in the May report. Nor is it clear why the May evaluation took place after the April IEP had already been issued. The only educational records reflecting A.N.'s kindergarten year are those contained within the May 2008 IEP, which focus on the team's recommendations for A.N.'s first-grade year. (*See* A.R. 179–92.)

6. A complete copy of the May 12, 2008 IEP Report appears at pp. 137–50 of the Administrative Record. A second, but incomplete, copy appears at pp. 179–92.

"some inappropriate behaviors" over the course of the school year, A.N. had "made some progress in this area." (*Id.* at 140.) The 2008 report also provides that the Child had achieved some academic success, but that his performance was at the 70% rate in reading and writing and the 50% rate in math, and that he "requires much repetition and review of information being presented." (*Id.* at 139.) The record does not contain any other evidence of A.N.'s academic, medical or behavioral progress throughout the 2007–08 school year.

In April 2008, A.N. received a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD") and began taking medications including Adderall and amphetamine salts in connection with this diagnosis the following month.[7] Although the Record does not contain direct evidence from the diagnosing doctor, there appears to be no dispute as to either the diagnosis or the medications. Rather, the diagnosis, the medications, and the name of the treating doctor are all set forth in attachments to the Administrative Record, which are entitled "Medications—Undated" (Exhibit 9E), "Recent Medical Treatment" (Exhibit 10E), and "Medications" (Exhibit HE). (*See* A.R.

131–36.) These exhibits appear to be the completed forms submitted by plaintiff in connection with her initial appeal, and in advance of the November 2008 hearing. They are consistent with one another insofar as they indicate that A.N. was being treated by a doctor named "Farhan Matin," and that this doctor had diagnosed the Child with ADHD. (*See id.*) Although these exhibits contain three slightly inconsistent lists of medications,[8] it does not appear that these slight discrepancies are material to the dispute before the court.[9]

In August 2008, shortly after plaintiff filed her claim for SSI benefits, A.N. was evaluated by two consulting physicians at the request of the Social Security Administration (the "Administration"): Christopher Ricci, Ph.D. ("Dr. Ricci"), performed a Child Psychiatric Evaluation on August 4; and Mindy Singer, M.A. ("Ms. Singer"), conducted a Speech and Language Evaluation on August 8. (*See* A.R. 225–33.) Also in August 2008, A.N.'s file was submitted to two additional, non-examining consultants for review. Upon such review, G. Peters, Ph.D. ("Dr. Peters"), a psychologist, issued an opinion dated August 11, in which he concluded that A.N.'s impairment

---

**7.** The diagnosis and these medications are referred to in the reports of two of the consulting physicians. (*See* A.R. 225, 230.)

**8.** Exhibit 9E lists Diphenhydramine, Amphetamine, and Adderall, with no date setting forth when the drugs were first prescribed. (A.R. 131.) The next exhibit lists Adderall and something that appears to be "Guarfacine," prescribed in May 2008 and October 2008, respectively. (*Id.* at 135.) Finally, Exhibit 11E lists "Amphetamine Salt Combo tab," "Diphenhydramine HCL Cap" and "Adderall XR Cap." (*Id.* at 136.)

**9.** With the exception of "Guarfacine," which the ALJ referred to as "Guarfachie" but did not otherwise discuss with plaintiff (*see* A.R. 44), all of the listed medications are commonly used in treatment of ADHD. Adderall is an

amphetamine prescribed for treatment of ADHD; its generic form is Amphetamine Salt Combo. *Adderall*, PDR Health, Physician's Desk Reference, available at http://www.pdrhealth.com/drugs/adderall (last visited July 31, 2014). Adderall XR is a longer-acting form of Adderall, which is given in a single daily dose. Vincent Iannelli, M.D., *Adderall and Adderall XR for ADHD*, available at http://pediatrics.about.com/od/adhd/a/adderall.htm (last visited July 31, 2014). Diphenhydramine is the generic name of an antihistamine that may be used as a sedative. Omudhome Oqbru, PharmaD and Jay W. Marks, M.D., *Diphenhydramine, Benadryl*, available at http://www.medicinenet.com/diphen hydramine/article.htm (last visited July 31, 2014).

was severe but did not medically or functionally equal the SSA listings; and C. Liddie ("Mr. Liddie"), a speech language pathologist, issued an opinion dated August 13, in which he apparently approved the conclusions of Dr. Peters and added his own, similar conclusions relating specifically to A.N.'s speech and language development. (*See id.* at 234–49.)

By Notice dated August 14, 2008, the Administration denied plaintiff's claim for SSI benefits, citing the reports of Doctors Ricci and Peters and of Speech Pathologists Singer and Liddie. (*See* A.R. 64.) The only medical records cited in this Notice were the 2002–2007 records from Woodhull Medical Center, reflecting the ear infections and injuries discussed previously. The Administration concluded that, even though the evidence shows that the Child had a behavior problem, the problem appears to have "stabilized" with treatment, and, notwithstanding certain "limitations to his activities, his condition does not interfere with his ability to perform most age appropriate activities." (*Id.*)

In response to the denial of her claim, plaintiff requested a hearing by an Administrative Law Judge.

## II. The Hearings

### a. The November 2008 Appearance

On November 18, 2008, plaintiff appeared before ALJ Miriam L. Shire. The hearing set for that date was adjourned, however, to give plaintiff a chance to obtain legal representation.[10] Before adjourning, the ALJ asked plaintiff about the Child's treating doctors. Plaintiff informed the ALJ that A.N. had been seeing a psychiatrist twice a month for the previous six months. She did not remember the psychiatrist's name, but she showed the ALJ a document containing a chart number and some other identifying information. (A.R. 25–26.) Plaintiff also provided the name and telephone number of Dr. Farhan Matin, from Woodhull Medical Center, who had prescribed A.N.'s medication. (*Id.* at 26.) Plaintiff further informed the ALJ that A.N. was enrolled in a special education class, and that she and her husband (A.N.'s grandfather) were caring for A.N.'s two brothers, aged five and twelve, as well. (*Id.* at 27–28.) Finally, in response to the ALJ's request for plaintiff's signature "on two releases so [the ALJ could] try to get some updated medical records," plaintiff said, "Okay. It's not a problem." (*Id.* at 28–29.)

### b. The May 2009 Appearance

The second appearance was on May 29, 2009. During the course of those proceedings, ALJ Shire elicited testimony from A.N., himself, as well as from plaintiff, who was still not represented by counsel, and from Edward N. Halperin, M.D. ("Dr. Halperin"), "a licensed physician in the state of New York ... [who is] board certified in adult psychiatry and ... child psychiatry and [who works] primarily with the foster care agency that deals with children from about four to twenty-one in residential treatment in [ ] foster care situations." (A.R. 281.) At the outset of the hearing, the ALJ advised plaintiff that she would be moving into evidence the Child's file, which consisted of various administrative forms, including plaintiff's application for SSI benefits and the Administration's denial of her claim; the request for and notices of hearings before the ALJ; certain reports submitted in connection with the application; and the records relating

---

**10.** Plaintiff testified that A.N. did not accompany her to the hearing because she did not know that his presence was required. (A.R. 22.) Although the ALJ expressed some discomfort at the prospect of proceeding in the absence of the Child, she continued with the hearing in order to advise plaintiff as to her right to representation. (*Id.* at 23.)

to A.N.'s medical treatment and education previously discussed, including the reports of the consulting physicians and speech pathologists. (*See id.* at 261.) Although ALJ Shire had, at the previous appearance, stated her intention to obtain updated medical records, she did not discuss whether she had made any efforts to do so, and she did not move any such updated records into evidence. The record thus contains no evidence from A.N.'s treating psychiatrist, and the most recent evidence from Woodhull Medical Center is dated March 6, 2007. (*See id.* at 165.)

### c. A.N.'s Testimony

After explaining to A.N. the importance of being truthful during the proceedings, ALJ Shire questioned him about his school, his teachers, his friends and his academic skills, and about the activities he enjoys and his ability to care for himself. (*See* A.R. 263–71.) A.N. was generally responsive but frequently gave answers that were not audible to the court reporter. (*See, e.g., id.* at 264, 267, 268.) Dr. Halperin also asked A.N. about his relationship with his teacher and with his brothers. A.N.'s responses to these questions were not audible, but plaintiff advised Dr. Halperin that the Child was getting along "a little bit" better with his brothers and that he generally plays by himself. (*Id.* at 272.)

### d. Plaintiff's Testimony

ALJ Shire then examined the plaintiff, who testified that A.N.'s behavior had improved since he started taking Adderall (in May 2008), but that she had nonetheless been called to the Child's school twice in the preceding year: once when A.N. had gotten angry and "started throwing everybody's books all over the place," and another time when he got angry and was "trying to stab a little boy with a pencil." (*Id.* 275–76.) The ALJ asked whether, on these occasions, A.N. had, perhaps, missed his medication, to which plaintiff responded, "No. He was just like angry about something. I don't know what it was about. . . . Because I constantly give [the medicine] to him when he get up in the morning and then in the afternoon and stuff." (*Id.* at 277.)

Plaintiff further testified that A.N. had made some academic progress over the course of his first-grade year, and that he was able to sit still for short periods of time to color, do his homework, and read or look at the pictures in a book.[11] She also testified that he likes to help set the table at home and that he likes to try to dress and bathe himself—although there is always an adult with him to help. However, she also said that he was occasionally non-responsive when she spoke to him, that he still had tantrums and hit his brother, and that he still picked at his skin and nails. (*See id.* at 277–81.) Prior to the conclusion of her testimony, Dr. Halperin asked plaintiff about A.N.'s relationship with his mother; plaintiff confirmed that it

---

**11.** The testimony relating to A.N.'s reading skills is inconsistent, and it is thus not clear whether he is able to read. When asked by the ALJ whether he could "read some words," A.N. replied, "Yeah." (A.R. 266.) The ALJ asked, "What kind of words can you read?" A.N. responded, "Books. Words." (*Id.*) However, when plaintiff was asked about the Child's ability to do his homework, plaintiff testified that he would sit, "[f]or a little while," but then ask for help. (*Id.* at 280.) She continued, "[i]f it's something like he like to do, like every night that the teacher will (inaudible) tell him to do, like read to him for five minutes. He'll look through the pictures. *Even though he not know how to read the book* and he'll say, grandma, finish. And that's that." (*Id.*, emphasis added.) The ALJ then asked whether "he can read—you find that he can read?" Plaintiff responded, "He can read," (*Id.*)

was "reasonably good."[12] (*Id.* at 283.)

### e. Testimony of the Non–Examining Independent Medical Expert

Dr. Halperin then testified that, based upon his review of the records and his observation of the Child during the proceedings, it appeared that A.N.'s prognosis had improved since he started the medication. He further stated his belief that A.N.'s condition had improved in the time since his examination by the consulting physicians:

> He is having some difficulties adequately maintaining appropriate social behavior. That would be like stabbing someone.... He appears capable of responding appropriately to changes in the environment. And now the learning appears to be much better than it was previously. He appears capable of asking questions and requesting assistance in an age-appropriate manner and being aware of dangers (inaudible). He seems to be doing well enough right now. And hopefully, it'll continue.

(A.R. 284.) Dr. Halperin testified that he generally agreed with the conclusions of Dr. Peters and Mr. Liddie that A.N.'s limitations were less than marked in the domains of speech/language, attending and completing tasks, and interacting with others; he found no limitations with respect to moving about, manipulating objects, self-care, and physical health. (*Id.* at 285.) Finally, in response to the ALJ's query about "the listing of ADHD," Dr. Halperin stated, "I don't think he has that right now." (*Id.*)

### III. The Findings of the ALJ

The SSA regulations set forth the legal framework that an ALJ must follow in assessing the disability of a child. *See,* *e.g.,* 20 C.F.R. § 416.924(a). After concluding that a child claimant is not engaged in substantial gainful activity, the ALJ must determine whether the child has "an impairment or combination of impairments that is severe." *Id.* If the requisite severity is found, then the ALJ must further review the claim to see if the "impairment meets, medically equals, or functionally equals the listings."[13] *Id.* The ALJ examines the evidence to ascertain whether the medical findings are equal in severity and duration to the listings (i.e., the impairment is medically equivalent), or, if not, whether the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain (i.e., the impairment is functionally equivalent). 20 C.F.R. §§ 416.926, 416.926a. These "domains of functioning" are defined as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains are set forth in the regulations as follows: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and, health and physical well-being. *Id.*

Applying this framework, ALJ Shire issued a decision denying plaintiff's claim on July 2, 2009.[14] Although she concluded

---

**12.** Plaintiff testified that A.N.'s mother was currently in a drug treatment program, but that A.N. and his brothers had contact with her and had recently visited her there. (A.R. 282.)

**13.** The "listings" refers to the Listing of Impairments, which is in Appendix 1 of Subpart P of 20 C.F.R. § 404.3. For children, the

listings "describe[ ] impairments that cause marked and severe functional limitations." 20 C.F.R. § 416.925(a).

**14.** Although plaintiff argues in a footnote that the ALJ "committed numerous other violations of law," including the failure "to adequately analyze the evidence in relationship to the applicable Listing and the domains" (Plf.

that A.N. has not engaged in substantial gainful activity and that his impairment is severe, she also found that his impairment or combination of impairments is neither medically nor functionally equivalent to the listings. (*See* A.R. 10.)

The ALJ's decision contains a brief summary of the May 2009 hearing, including plaintiff's testimony that she "takes [A.N.] to a psychiatrist." (*Id.* at 11.) The decision does not, however, contain a discussion of the November 2008 appearance or of any effort to obtain additional medical records. ALJ Shire summarized Dr. Halperin's testimony and concluded that, although the Child's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," certain "statements concerning the intensity, persistence and limiting effects of the ... symptoms are not credible to the extent they are inconsistent with the finding that the claimant does not have an impairment ... that functionally equals the listings." (*Id.*) This purported "credibility" finding was not supported by any analysis of the truthfulness or reliability of the plaintiff.

With respect to the domains of acquiring and using information and attending and completing tasks, ALJ Shire concluded that A.N. has less than marked limitations. These conclusions are based solely on the reports of the consulting and reviewing physicians (Drs. Ricci and Peters). (*Id.* at 12–14.)

In her discussion of the domain of interacting and relating with others, ALJ Shire referred to the April 2007 IEP, in which the team concluded that A.N.'s behavior no longer interferes with instruction. (*See id.* at 15.) She neglected to mention the May 2007 report by the IEP team, however,

which states that the Child was "hyperactive and impulsive, which often interferes with his ability to attend and complete tasks." (*Id.* at 205.) In reference to the report of Ms. Singer, the speech pathologist who found significant speech delays, the ALJ wrote, "[t]he results obtained at this time *do appear to be significant, and as such are consistent with the claimant's allegations.*" (*Id.* at 16, emphasis added.) Nonetheless, on the basis of the report of Dr. Peters—the non-examining physician—and the May 2008 IEP, ALJ Shire concluded that A.N. has less than a marked limitation in this domain. (*Id.*)

The ALJ further found that the record reveals no limitations in the domains of moving about and manipulating objects, caring for oneself, and health and physical well-being. Her conclusion as to health and well-being was based on the opinion of Dr. Peters, the May 2008 IEP, and the August 2008 consultative examination; and her conclusion as to caring for oneself was based solely on the opinion of Dr. Peters. (A.R. 18–19.) ALJ Shire offered no basis for her conclusion with respect to the domain of moving about and manipulating objects. (*Id.* at 17.)

In accordance with her conclusion that A.N.'s impairment does not result in marked limitations in at least two domains or an extreme limitation in one, ALJ Shire found that the Child is not disabled and denied the application for SSI benefits made on his behalf. (*See id.* at 19.)

## IV. Other Procedural History

On July 9, 2009, plaintiff submitted to the Social Security Administration Appeals Council a Request for Review. By Notice dated October 26, 2009, plaintiff's request

Mem. in Supp. 26, n. 28), plaintiff does not elaborate on this argument. Even if plaintiff contends that ALJ Shire's application of the law to the facts was incorrect, there appears to be no dispute that she applied the appropriate legal framework.

was denied, and the Commissioner's Decision was rendered final. (*See id.* at 1–3.)

Plaintiff, acting pro se, initiated the present action on November 16, 2009. Defendant moved for judgment on the pleadings on May 18, 2010, and plaintiff responded by filing a letter from A.N.'s social worker and another from his special education teacher. (*See* ECF Doc. # 15.) Initially assigned to the Hon. Raymond J. Dearie, this matter was reassigned by Order entered August 1, 2011. (*See* ECF Entry, August 1, 2011.) By Order dated September 25, 2012, this court appointed Michael D. Hampden, Esq., as counsel to plaintiff, and directed the parties to schedule briefing on the present motion. (*See* ECF Doc. # 16.)

## DISCUSSION

### I. Standard of Review

A district court reviewing a final decision of the Commissioner must determine "whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002). "Substantial evidence has been defined by the Supreme Court as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position." *Batista v. Barnhart,* 326 F.Supp.2d 345, 352 (E.D.N.Y.2004). Where, however, "there are gaps in the administrative record or the ALJ has applied an improper legal

standard," the district court must remand to the Commissioner "for further development of the evidence." *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Pena ex rel. E.R. v. Astrue,* 2013 WL 1210932, at \*16 (E.D.N.Y., March 25, 2013).

### II. The ALJ's Duty to Develop the Record and the Treating Physician Rule

Before examining the sufficiency of the evidence, the district court "must first be satisfied that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (internal quotation marks and citation omitted). "[A] hearing on disability benefits is a non-adversarial proceeding," and the ALJ, who is tasked with ensuring the fairness of the proceeding, "generally has an affirmative obligation to develop the administrative record." *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996); *see also Jackson v. Astrue,* 2010 WL 814991, at \*1 (E.D.N.Y., March 8, 2010) ("It is axiomatic that social security proceedings are non-adversarial and that the ALJ has an affirmative duty to develop the record."). Where, as here, the claimant is not only unrepresented by counsel but also acting on behalf of a minor, the ALJ's duty to develop the record is "particularly acute." *Encarnacion ex rel. George v. Barnhart,* 2003 WL 1344903, at \*2 (S.D.N.Y., March 19, 2003). Failure to sufficiently develop the administrative record results in the denial to claimant of a full and fair hearing and is thus grounds for remand. *See, e.g., id.* at \*4; *see also Lopez v. Secretary of Health and Human Services,* 728 F.2d 148, 150 (2d Cir.1984); *Brown v. Barnhart,* 2003 WL 1888727, at \*\*8–9 (S.D.N.Y.,

April 15, 2003) (collecting cases), *aff'd*, 85 Fed.Appx. 249 (2d Cir.2004) (Summary Order).

Encompassed within the ALJ's duty to develop the record is the obligation to obtain medical information, as expressly set forth in both the Social Security Act and the corresponding regulations. The Commissioner "shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B); *see also* 20 C.F.R. § 416.912(d) ("Our responsibility ... we will develop your complete medical history for at least the twelve months preceding the month in which you file your application," and "[w]e will make every reasonable effort to help you get medical reports *from your own medical sources* when you give us permission to request the reports") (emphasis added). However, if, as here, the claimant indicates that the disability began less than 12 months before the application was filed, the Administration will "develop [the] complete medical history beginning with the month [claimant says the] disability began, ..." 20 C.F.R. § 416.912(d)(2).

█ Moreover, if the evidence received by the claimant's own medical source does not provide an adequate basis for a determination of disability, the ALJ must recontact such source to see if additional information is available. *Perez*, 77 F.3d at 47. Or, "[a]t a minimum, if the ALJ is inclined to deny benefits, [she] should advise a claimant that her case is unpersuasive and suggest that she supplement the record or call her treating physician as a witness." *Batista*, 326 F.Supp.2d at 354.

█ The regulations define the "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides ... medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. So central is the opinion of a treating physician to the evaluation of claims for SSI benefits that, " 'on the issue(s) of the *nature and severity of [the] impairment(s)'* [the opinion] will be given 'controlling weight' if [it] is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003) (emphasis in original) (quoting 20 C.F.R. § 404.1527(d)(2)). This deference to the claimant's treating doctor is known as the treating physician rule, and it "goes hand in hand" with the ALJ's duty to develop the record. *Batista*, 326 F.Supp.2d at 353. In fact, "the duty to develop a full record and to assist a pro se plaintiff compels the ALJ to move beyond pro forma compliance with the treating physician rule and to obtain from the treating source expert opinions as to the nature and severity of the claimed disability." *Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991). While the ALJ is not required to accept the treating source's opinion, on its own, as determinative of the issue of disability, she is not permitted to "arbitrarily substitute [her] own judgment for competent medical opinion." *Rosa*, 168 F.3d at 79.

### III. Remand is Appropriate in this Case

█ Here, the ALJ failed to obtain not only the opinions of the treating doctor and psychiatrist, but apparently made no effort to obtain any records at all from these sources. This omission, along with the inconsistencies in the scant educational records contained within this record, make clear that ALJ Shire did not fulfill her

obligation to develop a full record and assist this plaintiff who was, at the time, pro se.

Plaintiff clearly stated at the November 18, 2008 hearing that A.N. was attending regular sessions with a psychiatrist and provided identifying information relating to both the psychiatrist and the diagnosing doctor. Although there appears to have been some confusion regarding the name of the psychiatrist, ALJ Shire apparently had enough information to request plaintiff's signature on the forms needed to obtain updated medical records from the two treating sources. Her request indicates that she recognized the importance of reviewing such records in connection with her determination of A.N.'s eligibility for benefits. Unfortunately, the record here is devoid not only of these crucial medical records themselves, but also of information relating to any efforts on the part of the ALJ to obtain them.

The only evidence relating to A.N.'s behavior subsequent to his diagnosis and the commencement of medication is contained in the opinions of the consultative and the non-examining, reviewing doctors and speech pathologists. While it may be, as the Commissioner argues, that the opinions of these non-treating sources could constitute substantial evidence in some cases, there is. no basis for this conclusion here, given the absence of opinions from those in the best position to gauge the Child's progress: the physician who diagnosed the Child and prescribed the medication, and the psychiatrist who met with him consistently from the diagnosis onward. It is the treating sources who are the "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and [who] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). ALJ Shire neither obtained evidence providing this "unique perspective" herself, nor did she advise plaintiff of her right to supplement the record or call the treating doctors as witnesses, as she should have done given her inclination to deny benefits. *See Batista*, 326 F.Supp.2d at 354. As previously stated, such a failure to develop the record is ground for remand. *See, e.g., Moran v. Astrue*, 569 F.3d 108, 114 (2d Cir.2009) (vacating and remanding "because the ALJ should have developed a more comprehensive record"); *see also Blash ex rel. D.A.S. v. Colvin*, 2014 WL 1278151, at *5 (E.D.N.Y., March 27, 2014) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law, and while the ALJ's decision may ultimately be sustained, it cannot be upheld on the record now before me") (internal quotation marks and citation omitted).

Accordingly, the court remands this case to the ALJ with instructions to further develop the record by acquiring the records and opinions of Dr. Farhan Matin and the psychiatrist who treated A.N. in 2008 and 2009. *See, e.g., Scott v. Astrue*, 2010 WL 2736879, at *16 (E.D.N.Y., July 9, 2010) (remanding with specific instructions to ALJ).

The ALJ also failed to develop the record with respect to A.N.'s education. The regulations expressly provide that, if the claimant is in school or preschool, the Administration "will ask your teacher(s) about your performance in your activities throughout your school day. We will consider all the evidence we receive from your school, including teacher questionnaires, teacher checklists, group achievement testing, and report cards." 20 C.F.R. § 416.924a(b)(7)(ii). Although the IEPs from 2007 and 2008 are included in the

record, these reports do not contain information relating to the Child's daily performance, nor do they contain teacher questionnaires or report cards, all of which the regulations deem necessary to a determination of disability.[15] Moreover, as discussed above, the April 2007 IEP and the report issued in May 2007 by the IEP team are inconsistent with one another, and the ALJ did not make any effort to ascertain which of these two evaluations set forth the recommendations that were actually implemented. Furthermore, given that the Child was diagnosed in April 2008 and began medication in May 2008, the IEP issued in May 2008 does not encompass a broad enough time frame upon which to gauge the effect of such diagnosis and medication, and there was nothing in the record before the ALJ reflecting A.N.'s actual behavior or academic progress during the 2008–2009 school year. An ALJ who fails to develop the record sufficiently to fill such a gap cannot be said to have "met her duty to diligently develop the record." *Cespedes ex rel. Cespedes v. Barnhart,* 2002 WL 1359728, at *5 (S.D.N.Y., June 21, 2002). Accordingly, upon remand, the ALJ is directed to obtain the appropriate educational records.

Upon receipt of all the relevant records, the ALJ must re-evaluate the record and, if appropriate, conduct a new hearing. In re-evaluating the record after it is complete, the ALJ may not reject plaintiff's testimony as lacking credibility without explaining her reasons for doing so.

Finally, although plaintiff also seeks to refer this matter, upon remand, to a different ALJ, the court is not convinced that such action is necessary. While ALJ Shire erred by neglecting to obtain certain evidence, nothing in the record indicates that such neglect was motivated by any sort of animus that would prevent her from following scrupulously this court's directions regarding the development of the record. Nor does this record give rise to such "serious concerns about the fundamental fairness of the disability review process" as to render "remand to a new ALJ [ ] appropriate." *Sutherland v. Barnhart,* 322 F.Supp.2d 282, 292 (E.D.N.Y.2004).

## CONCLUSION

The ALJ's failure to develop the record resulted in the denial to claimant of a full and fair hearing. Accordingly, the Commissioner's motion for judgment on the pleadings is DENIED.

Plaintiff's motion for judgment on the pleadings is GRANTED insofar as this matter is hereby remanded for further proceedings consistent with this opinion. The plaintiff's motion is DENIED, however, with respect to her request that the matter be reassigned to a different ALJ.

Plaintiff's able appointed counsel is encouraged to continue his representation of plaintiff through the remand.

SO ORDERED.

---

**15.** The records from 2006 offer some additional insight but predate the disability period.